UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTINE KHAMI,

       Plaintiff,         Case Number 09-11464

v.                 Honorable David M. Lawson

ORTHO-MCNEIL-JANSSEN PHARMACEUTICAL,
INC., KEVIN GUENO, and REGGIE YOUNG,

      Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND AMENDING THE CASE MANAGEMENT AND SCHEDULING ORDER

Presently before the Court is the defendants' motion for summary judgment in this employment discrimination case. In her third amended complaint, plaintiff Christine Khami, a pharmaceutical sales representative, alleges that she was discriminated against, laid off, and not rehired by her former employer, defendant Ortho-McNeil-Janssen Pharmaceutical, Inc., and her former supervisors, defendants Kevin Gueno and Reggie Young, in violation of a number of federal and state laws. The plaintiff asserts claims for retaliation in violation of the Family and Medical Leave Act, termination of her employment in violation of public policy, gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and the Michigan Elliott-Larsen Civil Rights Act, and violations of the Michigan Whistleblowers' Protection Act and the False Claims Act. The Court heard oral argument on the motion on December 7, 2011. The Court now finds that certain aspects of the plaintiff's FMLA claim are not supported by the evidence, but fact questions preclude summary judgment as to other aspects of that claim. Similarly, fact questions exist with respect to the plaintiff's public policy, Whistleblowers' Protection Act, and False Claims

Act claims.  However, there are no fact issues on the Title VII and Elliott-Larsen gender discrimination claims and the defendants are entitled to summary judgment on those claims as a matter of law.  Therefore, the defendants' motion for summary judgment will be granted in part and denied in part.

I.

Christine Khami began working in April 1999 for Ortho-McNeil Pharmaceutical, Inc., a subsidiary of Johnson & Johnson, Inc., as a sales representative.  She became an employee of the Ortho-McNeil Neurologics, Inc. subsidiary on January 3, 2005.  One of her jobs was to market the drug Topamax, which was approved by the Food and Drug Administration (FDA) to treat seizure disorders and adult migraine headaches.

Khami lost her job in June 2008 when the Ortho-McNeil Neurologics sales force was disbanded.  All of the assets and liabilities of Ortho-McNeil Neurologics and Ortho-McNeil Pharmaceuticals, Inc. had been transferred to Ortho-McNeil-Janssen Pharmaceuticals, Inc. on December 31, 2007.   About half of the Ortho-McNeil Neurologics laid-off sales personnel were hired by another division of Ortho-McNeil-Janssen Pharmaceutical, Inc. called PriCara.  Khami was not among those that were rehired.  She believes the decision not to rehire her was based on a variety of illegal motives.

A.  Khami's claims

Khami's claims fall into three general categories.  First, Khami took medical leave from work from May to July 2006 and from August 17, 2007 through January 21, 2008.  That leave was covered under the Family and Medical Leave Act.  Khami contends that her supervisors did not arrange for coverage of her sales territory or accounts while she was off work, and that resulted in

-2-

poor sales performance figures on her record in 2006 and 2007. Those performance numbers, in turn, factored into the formula that the company used to determine who from the Ortho-McNeil Neurologics sales force would be rehired by other divisions. Khami's performance rating — based on those sales figures — did not make her competitive for a new sales position. She alleges that the defendants' refusal to rehire her amounts to retaliation under the FMLA because the formula impermissibly factored in sales numbers that were depressed due to her FMLA absences from work and her supervisors' reaction to her leave, and the company did not strictly apply the formula when making decisions on whom to rehire.

Second, her employer, Ortho-McNeil Neurologics, encouraged its sales representatives to promote Topamax for "off-label" uses, which is illegal. In fact, on May 21, 2010, Ortho-McNeil pleaded guilty and was fined $6.14 million by the FDA for promoting Topamax to treat psychiatric disorders. Khami had testified before a federal grand jury in Boston, Massachusetts that investigated Ortho-McNeil's practices, and she believes her testimony was a factor in the decision not to hire her for a job at one or more of the "Johnson & Johnson Family of Companies." That, she says, violated the False Claims Act and the Michigan Whistleblowers' Protection Act. After she testified before the grand jury, Khami refused to market Topamax to pediatric psychiatrists for treatment of migraine headaches in children because the FDA had not approved the drug for that use. She believes that the defendants took adverse actions against her because of her refusal, which is the basis of her public policy claim.

Third, Khami had a poor working relationship with her immediate supervisor, Kevin Gueno. She had complained to the regional business director, Reggie Young, about Gueno's use of vulgar language, and she also complained to the human resources department about FMLA discrimination

and gender and race discrimination after Gueno began to subject her to more intense scrutiny and Young required her to complete an action plan. Khami believes that certain job requirements were imposed on her in retaliation for her complaints about gender discrimination; and she insists that she was not hired for at least one position because of those complaints. Khami contends that the defendants violated Title VII and the Michigan counterpart when they took those actions and poisoned the well so that another division would not hire her.

The claims are fact-intensive. Therefore, a detailed recitation of the record facts is necessary.

### B. Work history and environment

In March 2000, Ortho-McNeil Pharmaceutical enrolled Khami in the Management Development Process. As part of that program, she participated in a Competency Development Seminar, which provided her with feedback from the seminar's participants. Although her feedback was mostly positive, it included a few negative comments, including: "[H]er focus on her own agenda can limit how open she is to alternative views and others may sometimes see her as stubborn"; "[S]he can adopt an all-business style that lacks the genuine warmth and openness she shows at other times"; "Her attention to detail can also keep her from . . . let[ting] the rest of the group move on until her own information needs have been met." Mot. for Summ. J., Ex. 3, January 11, 2001 Seminar Feedback at 6.

In March 2001, Khami expressed an interest in the management intern program but was not selected. Despite that rejection, she was promoted to senior professional neuroscience representative on June 25, 2001. It appears that Khami had a significant personality conflict with Julie Graves, her first district manager.

-4-

In 2001 (although the plaintiff asserts it was 2002), Kevin Gueno became Khami's direct supervisor.  Khami and Gueno initially worked well together, but their work relationship quickly deteriorated because Khami questioned Gueno's management style and found him to be abusive and disrespectful.  Khami made various complaints about Gueno and his management style, the tenor of which are described in her numerous journal entries that are part of the record.  *See* Mot. for Summ. J., Ex. 10, Khami Journal entries.

In September 2003, Gueno, with regional business director (RBD) Judy Wicklum's approval, removed Khami from the Management Development Process.  Khami complained to Wicklum about Gueno's coach plans and the fact that Gueno did not have the trust and respect of his team.  Wicklum held meetings with Khami and Gueno to facilitate a better working relationship between them in October 2003 and November 2004.  Despite Wicklum's efforts, Khami complained to her doctor that Gueno was "emotionally abusive."  Mot. for Summ. J., Ex. 17, Khami Medical Records.  In June 2005, Gueno went through a "DM180 Feedback and Action Planning" program.  The program culminated in a feedback session, and Khami wrote on the debriefing slides, "The feedback showed Kevin had many, many issues.  J&J knew Kevin was not equipped to be a manager."  Mot. for Summ. J, Ex. 18, DM180 Feedback.

Khami alleges that four women complained about Gueno's gender-based derogatory comments.  Gueno allegedly made comments that "Women do not belong in the work force" and "Women belong at home with their children and not in the work force."  Resp., Ex. 6, Khami aff. ¶ 2.

Despite their tense work relationship, however, Gueno recommended Khami for a job with another Johnson & Johnson company, stating, "She would be an asset for any JNJ company like Tibotec." Resp., Ex. 7, November 28, 2005 Gueno e-mail to Nelson.

In October 2006, RBD Jan Jeffords-Schenck selected Khami to act as a regional trainer. Selection as a trainer did not entitle Khami to a pay increase or change in job title.

Reggie Young replaced Jeffords-Schenck as RBD in the beginning of 2007. Young received complaints about Gueno from Khami and two other sales representatives, Joanna Shaw Faison and Brian Beaufait, but he does not remember the issues they raised. Khami says she first complained to Young about harassment and retaliation in May 2007, but Young does not remember if she mentioned why she believed she was being retaliated against. Khami also complained to Young that Gueno used vulgar language and sent her nasty voice mails. In early May 2007, Young called the speciality representatives in for a meeting because he was upset about Khami going behind Gueno's back to complain directly to him.

Young also directed Khami to the human resources department, and Khami contacted Brenda Cannady in that department to complain about FMLA discrimination and gender and race discrimination. Cannady's notes from their conversation include the following statements:

> -2 of the 3 went to attorney and we believe the Topamax illegal marketing lawsuit emerged
> -Attorney questioned her in detail about the relationship with Kevin
> -subpoenaed to go to Boston to testify
> -attorneys came to her home going thru her training documents – removed 2 suitcases of documents
> -was forced to testify for the prosecution against J&J
> -asked what Kevin told her to put in call notes/ & his direction
> -asked about what happened in cycle meeting — trainer came in to sell off-label — attorney took notes for the training
> -also there were dinners where [indecipherable] spoke off-label — Kevin is aware of docs. taken fr[om] her

Mot. for Summ. J., Ex. 29, Cannady Notes from Telephone Call.

On May 30, 2007, Khami sent Cannady a follow-up letter that stated, in part:

<u>Legal:</u> I neglected to tell you the J&J attorneys knew of the situation (they interviewed me in 2005 and contacted me in Jan 06 when the subpoena came in), Paul Short also knew (he was my FSD at the time and his office contacted me in Jan 06 to ask for my cell phone number), Jan Jefford Schenk also knew (she was my RBD at the time), and of course Kevin Gueno knew. All of the proper management team knew as well as the J&J attorneys. I am assuming they also knew when Kevin received his subpoena sometime around June 06 (he testified 3rd quarter). . . . Please remember, I did not ask, or volunteer to be involved in the legal issues, rather, I was forced to testify.

<u>Race/Gender:</u> I feel mistreated; the behavior toward me from Kevin Gueno has been totally irrational. It has been consistent over the last 5 years and certainly gives the appearance of being racial or gender based. I can't help but think if I were African American this wouldn't be happening to me — I can't be specific, it is just a feeling. The behavior is absolutely irrational, and there seems to be a deep hatred for me. I haven't done anything to deserve this. I cannot understand how we can continue for 5 years and not have this situation resolved. This situation seems to be escalating without any rational basis.
. . .
<u>Untenable:</u> During our conversation, you asked me when this situation become [sic] untenable. In hindsight, I think I came to that point at the meeting w/ Reggie. He asked the group the question "who is afraid of Kevin?" I announced that I was. I was shaking. I explained that I was afraid of continued retaliation, continued harassment, and continued situations where Kevin would use his power to inflict power struggles.

Mot. for Summ. J., Ex. 30, Khami May 30, 2007 Letter.

In July 2007, Cannady initiated a facilitation through Common Ground, Johnson & Johnson's internal dispute resolution program. Khami, Gueno, Cannady, and Richard Martemucci, director of Common Ground, participated in the facilitation. Khami alleges, without citing the record, that Gueno, Young, and Cannady voiced displeasure over Khami's decision to involve Common Ground. Cannady also conducted an investigation during which she interviewed Jeffords-Schenck, Khami's former RBD. Cannady's notes state that Jeffords-Schenck considered Khami high maintenance. On July 30, 2007, Cannady informed Khami that she would not be able to report

to another manager and that her request for a 90-day rotation at corporate headquarters was denied because "upper management did not like [her] tone." Resp., Ex. 5, Khami dep. at 343; Ex. 6, Khami aff. ¶ 10. Cannady stated that upper management meant Joe Toscano, Reggie Young's boss.

In August 2007, Cannady concluded her investigation, finding no evidence of discrimination or retaliation. Her findings noted that a "[h]igh level of conflict with both current and former [district managers] lasting over extending period of time has left emotions raw and oriented to negative assumptions." Mot. for Summ. J., Ex. 34, Cannady's Findings. She also found that in 2007 Khami complained about retaliation for the Topamax case, harassment, a falsified coach report, lowered PDM ratings, lack of acknowledgment, and negative tone of communication. Following the investigation, Young asked Khami to complete her action plan, as the rest of the sales team and Gueno had done. At some point in August 2007, Young also told Khami that he did not think it was possible for her to have a healthy working relationship at Johnson & Johnson. Khami reported that comment to Richard Marteccui at Common Ground, and he told her that she would have to find a job in another Johnson & Johnson company or leave.

In June 2007, Young told Khami that additional representatives were being trained to serve as regional trainers, and therefore, Khami and Che Wright would not be needed for the next training session. Young's e-mail stated:

> Both you and Che will not be needed for the next Pre ST 101 class. The Central Region is coordinating the training for the upcoming July 9 & 10 class. FYI we are in the process of training additional representatives so both you and Che will not have to train every single class. My ultimate goal is to have a pool of Pre ST 101 trainers to choose from.

Mot. for Summ. J., Ex. 32, Young 6/22/07 e-mail. Young testified that he made the decision because he wanted the representatives to be able to focus on where they got paid: their marketing

-8-

and sales.  Young never contacted Khami again about serving as a regional trainer, but he continued to use Che Wright.

Khami also alleges that Gueno refused a vacation request she made in August 2007, despite that it was made within company guidelines, because he was going to have a team meeting on the day she wanted to take off.  However, the meeting was not held, and Khami alleges that she lost her vacation time for that year.

### C.  Grand jury testimony and off-label marketing

On November 16, 2004, Khami was interviewed by Johnson & Johnson's attorneys about Gueno, her team members, and the off-label marketing of Topamax,  About two months later, she was promoted to executive sales representative.  In February 2006, Khami testified before a federal grand jury in Boston, and the law firm Choate Hall & Stewart represented her; however, Choate Hall was retained and paid by Johnson & Johnson.  When Khami returned from testifying, she says, she told Gueno that the company had been training them on how to engage in off-label marketing and that she would no longer do it.  Gueno told her: "That's why you don't get any awards."  Resp., Ex. 5, Khami dep. at 420.

When Gueno was subpoenaed to testify before the grand jury as well, he asked Choate Hall & Stewart for the notes with the plaintiff's testimony and the documents she provided to the grand jury.  The Choate Hall lawyers gave him those notes without the plaintiff's consent.  Gueno also went to New Jersey to review the plaintiff's documents that were subpoenaed.  The plaintiff later sued the law firm for legal malpractice in this court, alleging conflict of interest, but the suit was dismissed on March 10, 2009 without prejudice pursuant to the parties' stipulation.

On June 7, 2006, while Khami was on leave, she received a telephone call from attorney Dianna Lloyd during which Lloyd told Khami that Gueno had been subpoenaed and requested permission to share information from Khami's grand jury testimony with Gueno. Khami consented, and Lloyd later told Khami that "she released general information about [Khami's] testimony." Resp., Ex. 5, Khami dep. at 408, 411. There is a dispute as to whether Gueno was ever told about the substance of Khami's grand jury testimony. Gueno testified that no one ever informed him of the substance of Khami's the testimony. But Khami's July 24, 2007 journal entry states that she "authorized my atty to cooperate with Kevins atty to help Kevin prep for his testimony." Mot. for Summ. J., Ex. 10, Khami's July 24, 2007 Journal Entry. Additionally, Khami testified that Gueno made a comment to her after his grand jury testimony about the "Marriott notes" and how they had been selling off-label. The Marriott notes refer to notes taken during a meeting at a Marriott Hotel at which a person identified in the record only as "Dr. Conner" allegedly trained Khami and her fellow sales representatives to sell off-label. However, Khami was not sure Gueno was referring to the notes she had taken during the Marriott meeting, although she assumed he was referring to those notes. Gueno testified before the Grand Jury in September 2006.

Khami attended a regional meeting in Chicago from February 2 to February 4, 2008, just after she returned from a medical leave of absence, where off-label studies were given to the sales team and Khami was encouraged to call on pediatric neurologists to promote Axert and Topamax business. Khami complained to Gueno that the practice amounted to off-label marketing and that she would not do it. She contends that although Topamax was approved for treatment of seizures in children, the company encouraged its representatives to promote its use to treat migraines in children, and that use had not been approved by the FDA.

-10-

### D.  FMLA leave

Khami took FMLA leave from May to July 2006 for a surgical procedure.  She also took FMLA leave from August 17, 2007 through January 21, 2008 for medical reasons.  When an Ortho-McNeil Janssen Pharmaceutical employee took an extended leave, the employee's territory could be covered one of several ways, depending on the size of the territory and number of doctors in that territory.  It was up to the district manager to decide whether the territory would be divided among several sales representatives or whether just the key doctors would be covered.  While Khami was on leave, Gueno gave the other sales representatives a list of Khami's larger accounts and told them to drop off samples to the doctors on a regular basis.  However, it appears that the other sales representatives only provided samples to Khami's three group practices and none of her other clients.  In addition, Rob Lammers told Khami that he would not provide her clients samples unless she furnished them and that he would not put much effort into finding samples.  Forty-six of her fifty accounts never saw a representative while she was on FMLA leave.  Needless to say, Khami was not happy with the coverage her clients received while she was on leave.  Khami alleges that Gueno's failure to arrange for coverage caused her sales numbers to drop, and the drop affected her bonus payout, her annual review, and pay raise.

On February 13, 2008, Gueno, Lammers, and Khami met with Sue Wesserling, the director of the American College of Neurologists and Psychologists (ACN) in an attempt to get the client, ACN, back on board after the poor treatment it received while Khami was away on FMLA leave. During the meeting, Gueno informed Khami that she would not be allowed to go to the ACN meeting in Arizona, even though she had gone the last nine years, because she had been out on short term disability.

-11-

In May 2008, Gueno refused to accommodate Khami's restriction of working 40 hours a week, and she had to call Sandy Brown from the occupational department for assistance. Gueno also refused to allow Khami to have a work-hardening schedule, which involved her working from home part-time for two weeks, even though he had allowed Joanna Faison-Shaw to work from home when she had a difficult pregnancy.

### E.  Performance evaluations

During most of Khami's tenure with Ortho-McNeil-Janssen Pharmaceutical, Inc., employee performance was rated on a 1-through-9 scale, with 9 being the highest. For annual performance evaluations, employees were given scores in several categories, which were weighted differently, and then an overall score was calculated. Those categories included territory management/account management, selling skills, market/product knowledge, and sales results. To calculate the score for sales results, which accounted for 40% of an employee's overall rating, Ortho-McNeil-Janssen's corporate office compared the sales of all of its employees nationwide and rated its employees. The national corporate office would provide that number to the district managers. The district managers had discretion to determine an employee's score in the other three fields. The district managers brought their draft evaluations and proposed scores to a "calibration" meeting led by the regional business director. At the calibration meeting, the district managers would adjust rankings and scores based on the regions' sales results and performance to ensure that all of the sales representatives were evaluated using the same standards.

Khami received an overall score of 7 on her 2003 performance evaluation and a $3,200 merit pay increase. In 2004, Khami received an overall score of 8 and a $3,700 merit pay increase. In 2005, Khami received a 6 for territory management, an 8 for selling skills, an 8 for market/product

knowledge, a 5 for sales results, and an overall score of 6.6, which was rounded to 7. Following the 2005 evaluation, Khami received a $3,472 merit pay increase.

In July 2006, Khami received her mid-year 2006 evaluation, which indicated that she was on track to meet her goals. Khami testified that she believes that the July 2006 mid-year evaluation was the first instance of retaliation because it was inaccurate.

Gueno proposed giving Khami an overall score of 7 on her 2006 year-end evaluation. The defendants assert that for the 2006 year-end evaluations, Ortho-McNeil-Janssen directed that an employee's score for any category could not be more than two points above her sales results score. There is no documentation in the record that confirms that testimony, however. Jeffords-Schenck communicated that policy to the district managers during the calibration meeting, and the defendants contend that the new policy was applied to all employees' 2006 year-end evaluations. As a result, Gueno was required to change Khami's selling skills and market/product knowledge scores from 8s to 7s because her sales results score was 5. Khami's final composite score was a 6.2, which was rounded to 6. Khami finds that baffling because she alleges that her sales numbers and sales ranking within the company were higher than the previous year, although she did not file deposition pages or documentary evidence that she claims support that fact. The performance rating scale defines a 6 as "[p]erformance econsistenly meets and frequently exceeds job standards." Mot. for Summ. J., Ex. 20, Performance Scale. Khami received a $3,700 merit pay increase following the 2006 evaluation.

Khami confronted Gueno about her 2006 evaluation (referred to generally in the record as PDP), and Gueno stated that she had "started out strong but had died out in the middle," which was the period she was absent from work on FMLA leave. Resp., Ex. 6, Khami aff. ¶ 1. Khami also

-13-

alleges that Gueno refused to forward her e-mail and voice mail messages to other managers and did not allow her to volunteer for specialty positions, both of which decreased her exposure and her chances of doing well in the calibration process, because other managers were less familiar with Khami's work.

Khami received the same scores on her 2007 evaluation, with an overall score of 6, and a $4,600 merit pay increase.

Khami also contends that Gueno disparaged her and discouraged other workers from associating with her. She wrote in her journal that on June 13, 2007, Gueno told Brian [last name unknown]: "Be careful who you pick as a friend." Mot. for Summ. J., Ex. 10, Khami June 13, 2007 Journal Entry.

### F.  Ortho-McNeil Neurologics Sales Force disband and PriCare redeployment

On July 25, 2008, the entire Ortho-McNeil Neurologics sales force was disbanded because of significant business challenges, one of which was the expiration of the Topamax patent. The Neurologics sales force had an opportunity to be rehired by PriCara, another division of Ortho-McNeil-Janssen Pharmaceuticals, because it was expanding its sales force for pain medications and creating new sales territories. Project Ottawa, as Ortho-McNeil-Janssen Pharmaceuticals called it, was the process used to redeploy existing PriCara employees and displaced Ortho-McNeil Neurologics employees into PriCara. According to company representative Frank Folio, Ortho-McNeil-Janssen Pharmaceuticals used a third-party vendor, ZS Associates, to help with developing placement rules. The defendants assert that ZS Associates used a computer program to place PriCara and Ortho-McNeil Neurologics employees into PriCara territories and districts using an

-14-

objective set of placement criteria, although they did not attach the page from Folio's deposition they say supports that proposition.

PriCara and Ortho-McNeil Neurologics sales representatives were considered for PriCara territories and product teams in 15 waves. PriCara employees were considered first and given a preference because of their familiarity with PriCara's products and customers. The defendants contend that the following rules were used for selection:

(a) Only employees with a 2007 performance rating of 4 or higher were eligible for Waves 1-7.

(b) Only current PriCara representatives were eligible for Waves 1-2 and 4-5.

(c) In Wave 3, PriCara representatives rated 4 or higher who were not placed in the first two waves, were considered for territories which overlapped their current territories. Also, Ortho-McNeil Neurologics representatives rated 4 or higher were considered for the PriCara territory with which their Ortho-McNeil Neurologics territory had the highest amount of overlap and as to which they were located no more than 30 miles from the territory's border.

(d) Ortho-McNeil Neurologics representatives also were considered in Waves 6 and 7, provided that they had performance ratings of 4 or higher, and either lived in the new territory or were located no more than 30 miles from the territory border.

(e) The selection rules for PriCara and Ortho-McNeil Neurologics representatives eligible for Wave 3 were applied in the following order:
  (1) the representative with the highest 2007 performance rating was selected, but representatives with scores within plus or minus one of each other were considered to be tied;
  (2) if an Ortho-McNeil Neurologics and a PriCara representative tied as to the first rule, the position was awarded to the PriCara representative;
  (3) if two Ortho-McNeil Neurologics representatives tied as to the third rule, the tie was broken by considering overlap with the new territory (however, a difference of plus or minus 20% overlap was considered to be a tie);
  (4) a tie as to the third rule was broken by considering tenure with the J&J Family of Companies;
  (5) if there was still a tie after considering tenure, the tie was broken by considering the representatives' distance from the territory center.

-15-

(f) The selection rules for PriCara and Ortho-McNeil Neurologics representatives eligible for Waves 6 and 7 were the same as those for Wave 3, except that the third rule (overlap) was omitted.

Mot. for Summ. J., Ex. 39, Ortho-McNeil Neurologics Organizational Update; Ex. 37, Folio dep. at 93-96, 101-08.

The defendants assert that all of the PriCara territories with which Khami overlapped were filled in Waves 1 through 5 by PriCara representatives.  The defendants also assert that the single territory where Khami competed for a position was Jackson, Michigan, in Wave 6 of the process. Applying the selection rules for Wave 6, Khami, whose 2007 performance rating was 6, tied with Russell Carpenter, a PriCara representative whose 2007 rating was 5, along with several other Ortho-McNeil Neurologics representatives who had received ratings of 5 and 6.  Russel Carpenter was selected because he was a PriCara representative.

After the placements were made, approximately 95% of PriCara representatives were retained, 60% of Ortho-McNeil Neurologics specialty representatives (the division in which Khami worked) were placed into PriCara, and 48% of the Ortho-McNeil Neurologics primary care representatives were placed into PriCara.  Of Khami's sales team, five other sales representatives were not placed into Pricara, including Rob Lammers, who did not testify before the grand jury.

Khami, like all other Ortho-McNeil Neurologics representatives, was eligible for only one territory in Wave 3 — the territory with which she had the highest individual overlap.  In Khami's case, this territory was Detroit North.  However, an existing PriCara representative already had been placed into Detroit North during a previous wave, and therefore Khami could not be placed during Wave 3.  Brian Beaufait, an Ortho-McNeil Neurologics sales representative, was initially placed into the Detroit South territory in Wave 3, which was the PriCara territory with which he had the highest

-16-

individual overlap.  Beaufait, however, decided to leave Ortho-McNeil-Janssen Pharmaceutical before the placement process was finalized; therefore Tyrone Williams, a PriCara sales representative, was placed into the territory using the Wave 3 selection criteria.  Caroline Faber, an Ortho-McNeil Neurologics representative, was placed into the Toledo North territory in Wave 3, which was the PriCara territory with which she had the highest individual overlap.

### G.  Job applications to other divisions

Following her lay-off in July 2008, Khami applied for over 100 positions with various companies within the Johnson & Johnson family of companies.  She offers evidence only on the following three as examples of how the defendants retaliated against her.

### 1. Dearborn McNeil Pediatrics

In September 2008, a Johnson & Johnson recruiting manager contacted Khami about a position with Dearborn McNeil Pediatrics.  Khami had three interviews with the district manager, Ted Dorn, one field ride-along with Karen Wagner, and one interview with Ted Dorn's managing partner.  Dorn avers that Khami was late to two of the interviews, but Khami testified that she was never late for any interview.  Dorn testified that he had Khami interview with his boss, Sean Hooper, even though Khami was his third choice because the first-choice candidate removed herself from consideration and the second choice was rejected by Hooper.  But Khami contends that she was told by the recruiter and Dorn that her interview was merely a "blessing interview."  Resp., Ex. 6, Khami aff. ¶ 25.  Dorn also sent Khami an e-mail asking her to contact him following her interview with Hooper.

Khami met with Sean Hooper on September 23, 2008.  Hooper asked to see Khami's previous annual reviews, which she did not have with her, but she offered to fax or mail them to him.

-17-

After the interview, Hooper contacted Young, and although Hooper could not remember what he and Young discussed, Young testified that he told Hooper that Hooper would have to speak with the human resources department about Khami.

About one week after the interview, Khami learned from Ted Dorn that she did not get the job. There is a discrepancy as to why Khami was not hired. Dorn testified that he decided not to hire Khami because she was late for two interviews and he felt she would not be the right fit for that territory. However, Dorn's boss, Hooper testified that Dorn did not make the decision, rather someone in senior leadership made the decision to leave the position open. Hooper characterized the process as follows:

> Christine Khami advanced to [Hooper's] level for a final interview, [he] had a conversation with Reggie Young about her, and then at some point in time [Hooper] was informed by senior leadership that the position for which she applied was not going to be filled.

Resp., Ex. 16, Hooper dep. at 50.

### 2. Bay City position

On June 18, 2009, Nicki Gibson schedule an interview for Khami with Dorn for a new sales position in Bay City, Michigan, but Dorn cancelled the interview. When Khami attempted to reschedule the interview through Gibson, Gibson told her that Dorn did not want to interview her, allegedly because he had interviewed her in 2008 and did not need to interview her again. Khami e-mailed Dorn a copy of her resume and told him that she was very interested in the job. Dorn ultimately hired Debbie Elert for the position even though Elert had performance reviews of 3s and 4s.

### 3. Virginia position

-18-

On July 14, 2009, Khami spoke with Megan McLaughlin, a Johnson & Johnson recruiter, about a position with Ortho-McNeil Janssen in Richmond, Virginia. Khami informed McLaughlin that she would move to Richmond and was very interested. On July 21, 2009, Khami had a telephone interview with Gerard Vandermys. Vandermys was looking for a candidate with sales experience in specialty-type sales, the central nervous system, and selling to psychiatrists, child psychiatrists, and pediatricians. Following that first interview, Vandermys asked Khami for a Johnson & Johnson manager referral. Khami alleges that Vandermys asked her to send him her rankings, her Management Development file, and annual review, but she does not offer any citation to the record to support that fact. On August 4, 2009, McLaughlin told her that she was the top candidate and would be flown to Virginia to interview with Vandermys. McLaughlin also told Khami to begin looking for a place to live.

Khami had a second interview with Vandermys in Richmond, Virginia. At the end, Vandermys told Khami to do some more research on the products Invega and Concerta and to look into finding a place to live in either Hanover, Ashland, or Fredericksburg, Virginia. Vandermys spoke with Dorn, whom Vandermys had known for years, about Khami, and Dorn told Vandermys that he had not hired Khami for a position in Michigan. On August 24, 2009, McLaughlin e-mailed Khami to inform her that she was no longer being considered for the position. Vandermys testified that he chose not to hire Khami because she did not seem like a good fit, specifically that her answers around the various therapeutic drug classes (anti-psychotics and ADHD) were not substantial. Khami also received an e-mail from the defendant's human resources department on November 30, 2009 that stated: "Due to changing business needs, the position of Fredericksburg, Virginia Specialty Pharmaceutical Sales Representative has been canceled." *Id.* at 75. Despite

human resource's notice that the position had been cancelled, Vandermys hired David Dort for the position in December 2009.  Dort had no experience in specialty-type sales, central nervous system sales, or sales to psychiatrists, child psychiatrists and pediatricians, but instead sold medical devices to obstetricians and gynecologists.

### H.  Proceedings

On April 17, 2009, Khami brought suit against Johnson & Johnson, a number of Johnson & Johnson subsidiaries, and two individuals in her previous chain of command.   The original complaint contained four counts: (1) FMLA violation; (2) retaliation for the plaintiff's Grand Jury testimony and for her refusal to promote "off-label" drug uses in violation of public policy; (3) race discrimination, gender discrimination, and retaliation in violation of the Elliott-Larsen Civil Rights Act; and (4) violation of Michigan's Whistleblowers' Protection Act.  On September 10, 2009, before the defendants responded, the plaintiff amended the complaint to add a Title VII count alleging race and sex discrimination and retaliation.  Allegations made in both the initial and the first amended complaints were rather brief and generic.

After the defendants filed a motion to dismiss, the plaintiff filed a motion for leave to amend the first amended complaint.  The proposed second amended complaint added a count of retaliation under 42 U.S.C. § 1985 and significantly expanded the plaintiff's factual allegations.  On March 3, 2010, the Court dismissed the claim for violation of 42 U.S.C. § 1985; dismissed the claim for retaliation in violation of public policy to the extent that it alleged retaliation for the plaintiff's grand jury testimony; limited the Title VII and Michigan ELCRA claims to a discrete-discriminatory-act theory of gender discrimination; allowed the plaintiff to proceed only against the corporate defendants who were her direct employers; and instructed the plaintiff to file an amended complaint

-20-

that complied with the Court's decision before March 24, 2010.  The plaintiff filed a revised second amended complaint against Ortho-McNeil-Janssen Pharmaceutical, Inc., Kevin Gueno, and Reggie Young on March 24, 2010.  On November 2, 2010, the plaintiff filed a third amended complaint, adding a claim for violation of the False Claims Act, 31 U.S.C. § 3730.

On June 28, 2011, the defendants filed the present motion for summary judgment.  The defendants contest all the counts of the third amended complaint, alleging that many of the plaintiff's alleged gripes do not meet the definition of an adverse employment action, and those that do cannot be causally connected to an illegal motive on the part of the defendants.  The Court heard oral argument on the motion on December 7, 2011.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A trial is required only when "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A motion for summary judgment under Rule 56 presumes the absence of a genuine issue of material fact for trial.  The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

The party bringing the summary judgment motion has the initial burden of informing the court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. Fed. R. Civ. P. 56(c)(1)(A), (B); *Mt. Lebanon Pers. Care*

*Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). If the party opposing the motion contends that facts are in dispute, she may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his burden of proof, summary judgment is clearly proper. Fed. R. Civ. P. 56(e)(3); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

At the summary judgment stage, "the evidence should be viewed in the light most favorable to the non-moving party[, and] the facts and any inferences that can be drawn from those facts[] must be viewed in the light most favorable to the non-moving party.'" *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (citations omitted)); *see also Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) ("In evaluating the evidence, [the district court] 'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'") (quoting *PDV Midwest Ref., L.L.C. v. Armada Oil & Gas Co.*, 305 F.3d 498, 505 (6th Cir. 2002)).

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could

return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248).

### A.  FMLA Claims

As mentioned above, Khami took FMLA leave twice, once from May through July 2006, and again from August 2007 through January 2008.  She contends that the defendants retaliated against her in several ways for taking those leaves.  Because she took them, she says that the defendants gave her lower performance reviews in for 2006 and 2007; subjected her to heightened scrutiny and isolation; refused her request to take a vacation on a certain day; put her territory into "vacancy mode" while she was on leave; refused to allow her to attend a meeting with a client in Arizona shortly after she returned from her second leave; demoted her from a position of regional trainer; and terminated her and refused to redeploy her to PriCara and other divisions.

The Family and Medical Leave Act "entitles qualifying employees to twelve weeks of unpaid leave each year if, among other things, an employee has 'a serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003) (quoting 29 U.S.C. § 2612(a)(1)(D)).  Under the FMLA, "it shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1).  Such rights include the right to take FMLA leave and reinstatement upon return to the position the employee held before taking the leave or to an equivalent position.  29 U.S.C. § 2614(a)(1); *see also* 29 C.F.R. § 825.220(c) (stating that "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions. . . .").  "Employers who

violate § 2615 are 'liable to any eligible employee affected' for damages and 'for such equitable relief as  may be appropriate.'" *Cavin*, 326 F.3d at 719 (quoting 29 U.S.C. § 2617(a)(1)).

To establish a case of retaliation under the FMLA, a plaintiff must show that: (1) the plaintiff engaged in activity protected by the FMLA; (2) the employer knew that she was exercising a right under the Act; (3) the employer took adverse action against her after learning that the plaintiff exercised a right under the FMLA; and (4) there is a causal connection between the employee's protected activity and the employer's adverse employment action.  *Donald v. Sybra, Inc.*, --- F.3d ---, ---, 2012 WL 117613, at *3 (6th Cir. Jan. 17, 2012); *see also Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001).  The employer's adverse action need not be motivated solely by the employee's use of FMLA leave.  *Hunter v. Valley View Local Sch.*, 579 F.3d 688, 691 (6th Cir. 2009) ("The FMLA . . . authorizes claims based on an adverse employment action motivated by both the employee's use of FMLA leave and also other, permissible factors.").  Additionally, "[p]roof of temporal proximity between the protected activity and the adverse employment action, coupled with other indicia of retaliatory conduct, may give rise to a finding of a causal connection." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (internal quotation marks omitted).

Causation may be proved directly or inferentially.  There is no direct evidence of causation in this case, and the plaintiff does not seriously advance a direct evidence theory.  When causation is based on circumstantial evidence, courts use the familiar three-step *McDonnell Douglas* analysis used in most other employment discrimination cases.  *Donald*, 2012 WL 117613, at *3; *see also Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006) (noting that "federal courts follow the burden-shifting framework that the Supreme Court has prescribed for analogous civil rights cases described in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Community*

*Affairs v. Burdine*, 450 U.S. 248 (1981).").  Under the *McDonnell Douglas* analysis, a plaintiff must

first make out a *prima facie* case of retaliation under the FMLA.  *Skrjanc*, 272 F.3d at 315.  "The

burden then shifts to [the defendant] to articulate a legitimate, nondiscriminatory reason for [the

adverse action]."  *Ibid.*  If the defendant articulates such a reason, the plaintiff then has the burden

of showing that the defendant's articulated reason is a pretext.  *Ibid.*  "An employee can show

pretext by offering evidence that the employer's proffered reason had no basis in fact, did not

actually motivate its decision, or was never used in the past to discharge an employee."  *Smith v.*

*Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998) (citing *Kocsis v. Multicare Management, Inc.*,

97 F.3d 876, 883 (6th Cir. 1996)); *see also Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078,

1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Financial Serv.*, 557 U.S. 167,

---, 129 S. Ct. 2343, 2352 (2009).

The defendants argue that many of the slights and privations Khami cites do not meet the

definition of adverse employment action.  Most circuits apply the Title VII retaliation standard

announced in *Burlington Northern and Santa Fe Railway Company v. White*, 548 U.S. 53 (2006)

to FMLA retaliation claims.  *See Millea v. Metro-North R. Co.*, 658 F.3d 154, 164 (2d Cir. 2011)

(citing *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 979 (7th Cir. 2008) (applying *Burlington*

*Northern*'s anti-retaliation standard to FMLA retaliation claims); *Metzler v. Fed. Home Loan Bank*

*of Topeka*, 464 F.3d 1164, 1171 n.2 (10th Cir. 2006) (same); *McArdle v. Dell Prods., L.P.*, 293 F.

App'x 331, 337 (5th Cir. 2008) (per curiam) (same); *DiCampli v. Korman Cmtys.*, 257 F. App'x

497, 500-01 (3d Cir. 2007) (same); *Csicsmann v. Sallada*, 211 F. App'x 163, 167-68 (4th Cir. 2006)

(per curiam) (same)).  The Sixth Circuit "ha[s] often relied on Title VII precedent to analyze FMLA

retaliation claims."  *Hunter*, 579 F.3d at 691.  Therefore, a "materially adverse action is any action

by the employer that is likely to dissuade a reasonable worker in the plaintiff's position from exercising his legal rights." *Burlington N.*, 548 U.S. at 67-68 (holding that any action that "dissuaded a reasonable worker from making or supporting a charge of discrimination" constituted adverse action). In addition, a plaintiff may bring suit against a former employer for retaliatory references. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 339 (1997) (holding that, under Title VII, "employee" included former employees and that a former employee may bring suit against his former employer for providing a negative reference allegedly made in retaliation for [protected conduct]). The Court now turns to the specific instances of adverse action alleged by the plaintiff to have been motivated by her FMLA leave taking.

### 1. Lowered performance evaluations

The defendants, citing *Hollins v. Atlantic Company Inc.*, 188 F.3d 652, 662 (6th Cir. 1999) (holding that "[s]atisfactory ratings in an overall evaluation, although lower than a previous evaluation, will not constitute an adverse employment action where the employee receives a merit raise"), argue that Khami's evaluations are not adverse employment actions as a matter of law because Khami received merit raises. Khami, citing *Cutcher v. Kmart Corporation*, 364 F. App'x 183 (6th Cir. 2010) (holding that a reduced evaluation, which was based on a leave of absence, that ultimately lead to the employee's termination could constitute an adverse action and that a question of material fact existed because circumstantial evidence suggested that she was rated lower based on her FMLA status), argues that her lower 2006 and 2007 evaluations can be considered adverse employment actions. More recent Sixth Circuit law supports Khami's position. As the court explained:

> Normally, "a negative performance evaluation does not constitute an adverse employment action, unless the evaluation has an adverse impact on an employee's

wages or salary." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007) [(citing *Hollins*, 188 F.3d at 662)]. But a negative performance evaluation may rise to the level of an adverse action if the employee can "point to a tangible employment action that she alleges she suffered, or is in jeopardy of suffering, because of the downgraded evaluation." *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 789 (6th Cir. 2000).

*Kyle-Eiland v. Neff.*, 408 F. App'x 933, 941 (6th Cir. Jan. 27, 2011); *see also Tuttle*, 474 F.3d at 323 (holding that unfavorable job performance appraisal could constitute adverse employment action under the ADEA, even when it resulted in a pay increase, where the plaintiff could show that the appraisal likely resulted in the termination of her employment). Therefore, any performance evaluation that contributed to the termination of Khami's employment or rendered her ineligible for rehire can constitute an adverse employment action.

There is no evidence that Khami's 2006 mid-year or year-end evaluations affected her pay or materially affected her terms of employment; therefore the defendants are entitled to summary judgment on an any claim of retaliation based on those evaluations. Khami attempts to defuse the defendants' argument that she received higher pay increases in 2006 and 2007 by suggesting that her pay increases were based as a percentage of her salary and would have been even higher if Khami had received a seven instead of six. But there is no evidence in the record that supports that conclusion.

It is undisputed, however, that Ortho-McNeil Neurologics sales representatives' 2007 performance evaluations played a key factor in deciding who was redeployed to PriCara, and that an employee's sales results made up 40% of her overall performance rating. Khami points to evidence of Gueno's comments to Khami about her being an "HR case" and the fact that she started strong but "died out in the middle," and argues that those comments support the conclusion that her evaluation was based on the fact that her sales declined while she was on FMLA leave. Perhaps.

But the defendants' argument that a retaliatory motive cannot be inferred from the fact that its performance ratings were heavily weighted toward objective criteria is persuasive.

There can be little doubt that missing five months of work would negatively impact the plaintiff's sales. However, basing performance evaluations on objective metrics like sales volumes does not suggest an intent to retaliate against an absent employee for taking FMLA leave, unless there also is evidence that absent employees who did *not* take FMLA-covered were treated more favorably. The Secretary of Labor's regulations explain that point clearly:

> An employee is entitled to be restored to a position with the same or equivalent pay premiums, such as a shift differential. . . . However, if a bonus or other payment is based on the achievement of a specified goal such as hours worked, *products sold* or perfect attendance, *and the employee has not met the goal due to FMLA leave, then the payment may be denied*, unless otherwise paid to employees on an equivalent leave status for a reason that does not qualify as FMLA leave. For example, if an employee who used paid vacation leave for a non-FMLA purpose would receive the payment, then the employee who used paid vacation leave for an FMLA-protected purpose also must receive the payment.

29 C.F.R. § 825.215(c)(1), (2) (emphasis added). There is no evidence that non-FMLA-leave-taking employees were treated more favorably in the ratings calculus.

A company's decision to base its rating formula on performance by itself does not support an inference of retaliation against an employee who takes FMLA leave. The defendant's witnesses testified that for 2006 and later, the company implemented a rule that the overall rating could not be more than two points higher than the sales performance rating component. But there is no documentation in the record that confirms that policy. The Court is left to rely on the credibility of the defendants' witnesses on that point. However, "[w]hen 'reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited.'" *Alspaugh v. McConnell*, 643 F.3d 162, 168 (6th Cir. 2011) (quoting *Schreiber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010).

-28-

There is evidence that the plaintiff's performance rating was lowered because of sales performance, and that the lower rating was a domino that triggered her loss of placement in a PriCara position. The Court cannot conclude as a matter of law that the defendants actually applied the rating criteria in an objective manner, and therefore summary judgment is not appropriate on the plaintiff's FMLA claims based on lower performance ratings for 2007.

### 2. Heightened scrutiny and isolation

Khami alleges that she was subjected to heightened scrutiny and isolation, which the defendants admit may be considered an adverse employment action. *See Hill v. Nicholson*, 383 F. App'x 503, 513 (6th Cir. June 24, 2010) (recognizing that heightened scrutiny could constitute adverse employment action). However, the defendants argue that the instances of "heightened" scrutiny that Khami describes are no more than instances of inconvenience or personality conflicts. The defendants also argue that Khami has not established a causal connection between her FMLA leave and the heightened scrutiny.

Khami contends that the following instances support her heightened scrutiny theory: (1) to isolate her, Gueno allegedly made up a statement that Khami complained about sexual harassment with a doctor on whom she called while she was covering for another representative; (2) Gueno and Young told her co-workers that she was a bad apple and to stay away from her; and (3) Gueno began rejecting her program proposals and was overly critical in her coach plans, field reports, and reviews.

With respect to the false sexual harassment claim, the defendants argue that Khami admitted to the human resources department that she complained to Gueno that she was uncomfortable being alone with Dr. Al-Zouhayli at a martini and cigar bar. Gueno then told human resources personnel

that Khami felt uncomfortable because of sexual harassment. The defendants point out that according to Khami's own e-mail, Gueno reported that incident in 2004, three years before she first took FMLA leave.

The defendants argue that any isolation she experienced was a result of personality conflicts and Khami's own actions. Rob Lammers, another sales representative, testified that he was very upset at Khami's criticisms and her treatment of him while he covered her territory when she was on leave. The defendants argue that Khami treated the members of her team in a similar fashion when she criticized their handling of her accounts. The defendants argue that from the beginning, Khami's peers found her to be inflexible and stubborn.

Lastly, the defendants argue that Gueno's rejections of Khami's programs, issues surrounding the accuracy of reports, and his failure to meet her expectations with praise all arose before her FMLA leaves or any other protected activity. Khami complained a number of times about those issues with Gueno from the moment Gueno became her district manager through the last day of her employment. The defendants also argue that RBD Jeffords-Schenck testified that Gueno generally had problems with communication so she cannot establish that she was treated any differently than her peers.

Khami has not offered any evidence to establish a causal connection between her alleged heightened scrutiny and her FMLA leaves, either from a timing perspective or otherwise. For that reason, the defendants are entitled to summary judgment on Khami's FMLA claim for any alleged heightened scrutiny or isolation.

### 3. Refusal of request to take vacation on specific day

The defendants argue that the refusal of Khami's request for vacation at a specified time frame does not constitute an adverse employment action because she was not barred completely from taking vacation. In support, they cite *Boyd v. Presbyterian Hospital in City of New York*, 160 F. Supp. 2d 522, 537 (S.D.N.Y. 2001) ("The particular timing of a vacation is not so disruptive that it crosses the line from 'mere inconvenience' to 'materially adverse' employment action."). Morever, the defendants argue, Gueno did not bar her from taking vacation; he merely stated that her "presence would be valued" at a team meeting scheduled for the day that she requested. Mot. for Summ. J., Ex. 48, August 11, 2007 e-mail. Khami could have taken other days off, but chose not to do so. Khami argues that Gueno's refusal must be considered in the context of Gueno's other actions.

The defendants argue that even if the denial of her vacation request is considered an adverse employment action, Khami cannot establish a causal connection between her FMLA leave and the denial, and they had a legitimate non-discriminatory business reason for the denial. Gueno informed Khami that he was deciding between two dates for their meeting — one of which was the day that she requested for vacation. A February 2008 e-mail demonstrates that there was a discrepancy between Gueno's application of the vacation policy and Khami's understanding of the amount of notice required before a vacation and the scheduling of team meetings. After an exchange of emails regarding the policy, Khami stated, "Excellent! Thank you! We agree on the [Ortho-McNeil Neurologics] vacation policy." Mot. for Summ. J., Ex. 47, February 1, 2008 e-mail. Khami cannot establish a causal connection between the denial of vacation on a specific date and her FMLA leave, nor can she dispute the defendants' legitimate nondiscriminatory business reason.

The defendants are entitled to summary judgment on that aspect of her FMLA claim.

4. Action plan and extra e-learning classes recommended for Khami

The defendants argue that the e-learning courses were only recommended and that Khami never took them anyway. They also argue that even if the classes constituted an adverse employment action, Khami has not presented any evidence to establish a causal connection between the addition of the classes and her FMLA leave. The defendants contend that making Khami fill out an action plan is not an adverse employment action because Young had the whole sales team, including Gueno, complete action plans in 2008. Khami argues that assigning her extra classes and making her re-do her action plan are exactly the type of conduct that would dissuade a reasonable worker from exercising her legal rights.

The Court cannot accept the plaintiff's argument. Not only is it unlikely that the e-learning courses and the action plan constitute an adverse employment action, *see Agnew v. BASF Corp.*, 286 F.3d 307, 310-11 (6th Cir. 2002) (finding that being placed on performance improvement plan does not constitute an adverse employment action), Khami has not presented any evidence that establishes a causal connection between her FMLA leave and the extra e-learning courses (which she never took) and the action plan.

5. Vacancy mode coverage of her territory while on leave

The defendants argue that not providing samples to Khami's clients does not rise to the level of an adverse employment action by the defendants, and that they had a legitimate non-discriminatory business reason for the treatment of her accounts: company policy dictated that her territory go into "vacancy mode" during her leave. The defendants also argue that Khami cannot

establish a *prima facie* case of retaliation based on her dissatisfaction with the level of service the other representatives provided her accounts while she was on leave. Khami's response mentions these arguments only briefly, simply stating that all of Gueno's actions, when taken together, constitute retaliation.

There is little question that an intentional decision to treat Khami's clients poorly while she was on FMLA leave constitutes an adverse employment action. Her evaluations and raises are dependent on her sales figures. A reasonable juror could find that an employee would be dissuaded from taking FMLA leave if she knew that her accounts would be ignored while she was away and her performance evaluation depended on them.

The question is not whether her territory should have been placed in vacancy mode; the defendants have a legitimate business reason for that decision. Retaliation could be found if Young or Gueno instructed the other sales team members to ignore Khami's clients or refused to obtain extra drug samples. But there is no evidence of that. There is evidence that Rob Lammers refused to provide samples to Khami's clients unless she furnished them. However, his refusal cannot be attributed to the defendants, and there is a non-retaliatory reason for his actions. Khami acknowledges that there was a limit on how many samples a sales representative could take within a year. Every sample Lammers gave to Khami's clients meant one less for his own clients. Khami has not established a *prima facie* case of retaliation on this aspect of her claim.

6. Gueno's refusal to allow Khami to attend ACN meeting in Arizona

The defendants argue that it was Khami's idea that Lammers go to the meeting in her place. However, Khami has offered evidence that Gueno did not allow Khami to attend the ACN meeting because she had been out on disability leave, *see* Resp., Ex. 6, Khami aff. ¶ 18, and the evidence

-33-

must be viewed in the light most favorable to Khami.  A reasonable juror could find that this action would dissuade an employee from exercising her rights under the FMLA.

### 7. Demotion from regional trainer

Khami has presented evidence that Young's non-discriminatory reason for removing Khami as a trainer was pretext because Che Wright was not removed as a regional trainer.  However, two questions remain: whether that action would dissuade an employee for exercising her legal rights and whether the removal is causally connected to Khami's protected activity.  As to the first question, it is safe to assume, viewing the facts in the light most favorable to Khami, that losing such an additional unpaid duty would dissuade an employee from exercising her rights because she lost opportunity for exposure to the other managers and it made her seem less appealing during the performance rating calibration process.

However, Khami has not presented evidence to connect Young's decision to any particular protected activity.  He may have removed her because she took FMLA leave, testified before the Grand Jury, or had a disagreeable personality.  The evidence in the record allows only speculation as to the real reason.  That is not enough to survive summary judgment.

### 8. Termination from Ortho-McNeil-Janssen Pharmaceutical, Inc.

The defendants had a legitimate non-discriminatory reason for disbanding Ortho-McNeil Neurologics's entire sales force.  The fact that the entire sales force was disbanded is enough to establish in this case that the defendants did not act in a retaliatory fashion.  The defendant is entitled to summary judgment on the plaintiff's theory that termination was in retaliation for taking FMLA leave.

-34-

9. Failure to be redeployed into PriCara

The defendants argue that they created a set of objective selection rules and retained a third-party vendor to select which Ortho-McNeil Neurologics representatives were placed into PriCara. They also argue that even if Khami had received a 7 on her 2007 evaluation, she still would have not been placed into PriCara.  However, Khami has presented evidence to call into question the legitimacy of the defendants' business reason.  Frank Folio's testimony, especially his testimony concerning Brian Beaufait, establishes that the objective rules were not always followed.  When Folio was asked to explain how Brian Beaufait, a similarly situated representative who did not testify to the Grand Jury, was selected for placement in the Detroit South territory he was asked whether it was based upon applying the rules and he testified:

> Q: Okay.  And I thought from your earlier testimony that if we are dealing with a new team Pain, and we are dealing with a PriCara representative who had the same footprint, that they would go up against the CNS representative who had the next highest overlap; is that a fair statement?
> A. I would explain it a different way.
>
> Q. How would you explain it?
> A. I would explain it that this was for Brian Beaufait his highest match of any territory in Pain.  Mr. Dewitt: emphasis on the word "his" for the record.
>
> Q. Okay.  Alright.  So what happened, so you're saying that in Brian Beaufait's case this was his highest match; correct?
> A. Correct.
> . . .
>
> Q. And, again, looking at what we have marked as 2920, I don't see anywhere and feel free to tell me in these rules, anywhere in these rules where it provides that you look at an individual representative's highest best match; is that true?
> A. It doesn't reflect that here but it doesn't mean that that wasn't the intent and that this wasn't a summary of the rules.
> . . .

-35-

Q. Ok. Now, can we just, looking at the rules, can we just looking at rules, nothing else in front of us, just the rules, can we explain every placement based on those rules?

A. I don't think all.  I don't think every placement.  I think you will need to understand, again, once again, in the example you've used number three, that we are talking about the highest individual, the highest individual overlap CNS (central nervous system) into Pain.

Q. And you're saying that was Brian Beaufait's highest individual overlap; correct?
A. For Detroit South.

Q. And that was his best match; correct, geographical overlap wise, that was his best match?
A. Correct.

Q. And Brian was placed into that placement, wasn't he?
A. Yes, he was.

Q. And Brian Beaufait was a 7, correct?
A. Yes

Resp., Ex. 14, Folio dep. at 141, 144, 157.

Folio testified that not every placement could be explained by looking at the rules and that Brian Beaufait, who was a seven, was placed in a territory for which *he* was the best geographic fit. A jury could conclude that if Khami had received a 7, she may have received that placement.  If a jury does not believe the defendants' witnesses that the company adopted a policy in 2007 changing the rating system to heavily weigh sales performance, then the defendants' protestations otherwise could be found a pretext.  Therefore, summary judgment on that aspect of the plaintiff's claim is precluded.

### 10. Other jobs

Although Khami asserts that she was denied other jobs within the Johnson & Johnson family of companies based on her FMLA leave and her grand jury testimony, she offers little in the way to show that the defendants' negative references were connected to her FMLA leave.  The more

-36-

likely explanation, and the one a reasonable jury could find, is that the defendants retaliated against Khami for her grand jury testimony, her abrasive personality, and possibly because she refused to market Topamax off label after she testified. However, the refusal to extend job offers to Khami as a Dearborn McNeil Pediatrics sales representative, the Bay City position, or the Virginia position was too temporally remote from her return from her last FMLA leave to allow an inference of causality. And although the evidence allows the conclusion that Young and Dorn sidetracked her rehiring with negative references, there is no evidence that the references were prompted by the medical leaves. Therefore, the defendants are entitled to summary judgment on that aspect of the plaintiff's FMLA claim.

### B. Retaliation in violation of public policy claim

Khami alleged in her third amended complaint that she suffered adverse employment actions at the hands of the defendants because she refused to market the off-label use of medications, which is illegal. The defendants argue that Khami's claim fails because she has no evidence that she ever complained about or refused to sell drugs off-label, and because she cannot demonstrate that she was discharged because she refused to sell off-label. The Court agrees that the record contains no evidence that Khami's refusal to market drugs for off-label use was a factor in the defendants' decision to disband the Ortho-McNeil Neurologics sales force. The defendants' motivation for other action, however, is another story.

Although Michigan law allows termination of an at-will employee for any legal reason or no reason, Michigan "courts recognize an exception to this rule when the grounds for termination violate public policy." *Morrison v. B. Braun Medical Inc.*, 663 F.3d 251, 256 (6th Cir. 2011) (citing *Suchodolski v. Mich. Consol. Gas Co.*, 412 Mich. 692, 695, 316 N.W.2d 710, 711 (1982)); *see also*

*Hein v. All America Plywood Co., Inc.*, 232 F.3d 482, 486 (6th Cir. 2000) (stating that "[u]nder Michigan law, an employee may have a cause of action against [her] employer when [her] termination is contrary to clearly articulated public policy"). There are three elements to this claim: (1) the "plaintiff engaged in protected activity"; (2) "plaintiff was discharged"; and (3) "a causal connection exists between the plaintiff's protected activity and the discharge." *Clifford v. Cactus Drilling Corp.*, 419 Mich. 356, 368, 353 N.W.2d 469, 474 (1984) (Williams, C.J, dissenting); *see also Suchodolski*, 412 Mich. at 695-96, 316 N.W.2d at 711-12.

Adverse action against an employee violates public policy under Michigan law if it was "for 'failure or refusal to violate a law in the course of employment.'" *Humenny v. Genex Corp.*, 390 F.3d 901, 907 (6th Cir. 2004) (quoting *Suchodolski*, 412 Mich. at 695-96, 316 N.W.2d at 711-12). "[A] public-policy violation can be premised on a violation of a federal statute." *Lewandowski v. Nuclear Mgt.*, 272 Mich. App. 120, 128, 724 N.W.2d 718, 723 (2006) (citing *Garavaglia v. Centra, Inc.*, 211 Mich. App. 625, 631, 536 N.W.2d 805, 808 (1995)); *see also Authier v. Ginsberg*, 757 F.2d 796, 798 n.2 (6th Cir. 1985). "To establish a claim of wrongful discharge, a plaintiff must prove that one of the motives or reasons for Plaintiff's discharge or adverse treatment was [her] failure or refusal to violate the law. A plaintiff need not show that the protected trait or activity is the exclusive reason for discharge." *Morrison*, 663 F.3d at 257 (internal quotation marks, citations, and footnote omitted).

The Court believes that Khami has offered evidence that: she refused to sell Topamax off label in February 2006 after returning from her grand jury testimony, her refusal negatively impacted her subsequent performance evaluations, and her lower evaluation ultimately led to her not being retained.

-38-

During his deposition, Kevin Gueno was shown a memo he presented to Khami in December 2006 regarding her declining sales of migraine headache prescriptions. Gueno testified that the purpose of this memo was to bring to Khami's attention that the customers listed were experiencing declines in migraine prescriptions. Gueno conceded that some of the doctors who were identified as experiencing declining sales of Topamax for the treatment of migraines were child neurologists, for whom there was no approval for the use of Topamax to treat migraines. Khami argues that the December 2006 memo shows that Ortho-McNeil-Janssen Pharmaceutical broke out its sales figures for doctors, as presented to its sales representatives, by migraine versus epilepsy and still listed sales figures for migraine prescriptions by child neurologists. Gueno recalled that at least some of the sales representatives, and Khami says she will testify that she was one of them, complained to him about being required to call on child neurologists to market Topamax for the treatment of migraines in children after the grand jury investigation.

Gueno also testified that Ortho-McNeil-Janssen Pharmaceutical sent out a call plan and data and expected Khami to call on the customers listed, including child neurologists, and to market Topamax to them. He also testified that if Khami failed to follow the call plan, it would be reflected in her evaluation. He also testified that her failure to market Topamax for the treatment of migraines in children could impact her overall sales figures, depending how her physician mix was weighted towards child neurologists versus other physicians.

Ortho-McNeil-Janssen Pharmaceutical has attempted to assert that its Topamax sales for migraine and epilepsy were lumped together in "one market basket" and that sales representatives would not be expected to market Topamax to child neurologists for the treatment of migraines in

children.  However, that assertion is contradicted by Gueno's December 2006 memo that specifically directed Khami to increase her marketing of Topamax for migraines to child neurologists.

Contrary to the defendants' assertions, Khami testified that after her grand jury testimony in 2006, she refused to continue off-label marketing Topamax and Axert to child neurologists for the treatment of migraines.  Gueno acknowledged that for a sales representative's annual review their sales figures made up 40% of their evaluation and further that Khami's refusal to continue to engage in off-label marketing after her grand jury testimony could have adversely impacted her reviews.

There also is evidence that Khami's refusal to sell off-label and her complaints to human resources about that subject influenced Kevin Gueno and Reggie Young to give her negative references that caused her not to be hired by other divisions of Johnson & Johnson.  The defendants have offered non-retaliatory reasons for their actions, but the evidence supports a finding of pretext. For instance, Khami has offered sufficient evidence that Young's negative reference caused her to not be offered the Dearborn McNeil Pediatrics sales representative position.  Hooper testified:

> Christine Khami advanced to [Hooper's] level for a final interview, [he] had a conversation with Reggie Young about her, and then at some point in time [Hooper] was informed by senior leadership that the position for which she applied was not going to be filled.

Resp., Ex. 16, Hooper dep. at 50.  But Dorn, Hooper's subordinate, testified that he did not give Khami the job because she was late to two interviews and her personality did not fit the job. Hooper's and Dorn's contradictory testimony regarding why she was not hired raises a genuine issue of material fact.

Khami also applied for the job in Bay City, but was rejected by Dorn (again), and Dorn ultimately hired someone who had performance reviews of 3s and 4s.  Given Khami's superior

-40-

performance reviews, a reasonable juror could find that Young's negative comments about Khami influenced Dorn's decision to not hire her.

The Virginia position is more problematic for the plaintiff. On that position, Khami dedicates her response to arguing why a retaliation claim against Vandermys should survive summary judgment, but Vandermys is not a defendant in this case. Instead, Khami must offer evidence that the defendants prevented her from getting the job. Vandermys spoke with Dorn before deciding not to hire Khami, but Khami has not alleged any contact between Vandermys and any of the defendants. However, Vandermys decision not to hire her is still troubling. On November 30, 2009, Khami received an e-mail from human resources indicating that the position had been canceled due to changing business needs, even though Vandermys hired someone the next month. Nonetheless, only speculation could support a conclusion that Vandermys acted on an illegal negative reference from one of the defendants in this case. The Court concludes, therefore, that the record does not contain sufficient evidence to defeat summary judgment on a retaliation claim for failure to hire for the Virginia position.

The evidence, taken in the light most favorable to Khami, does establish a case for retaliation in violation of public policy for failure to rehire for the Dearborn and Bay City jobs, and the non-placement at PriCara.

## C. Gender-based claims

In the March 3, 2010 order granting in part the defendants' motion to dismiss, the Court dismissed the plaintiff's race discrimination, gender discrimination, and retaliation claim, except to the extent that it asserted a discrete-discriminatory-acts theory of gender discrimination. In her third amended complaint, Khami alleges that Gueno's comments created an environment hostile to

-41-

women, and that the defendants retaliated against Khami by giving her poor performance reviews when she complained to the human resources department about it.

The defendants argue that, to the extent Khami is claiming gender discrimination or retaliation based upon any of the alleged adverse employment actions discussed above in the analysis of her FMLA claim, her discrimination claims fail for the same reason, *i.e.,* there was no materially adverse change; there are no circumstances that give rise to the inference of discrimination and/or causal connection to establish a *prima facie* case; the defendants had a legitimate non-discriminatory business reason; and there is no evidence of pretext. The defendants also argue that any of Khami's claims regarding retaliation under Title VII and the Elliott-Larsen Act relating to adverse employment actions occurring before May 2007 should be dismissed because May 2007 was the first time Khami complained to the human resources personnel.

As a result of the March 3, 2010 order, there is no hostile work environment claim in play here. Khami has alleged a retaliation claim, however, and she bases it on her complaints to Reggie Young and the human resources department. The record shows that the first such complaint occurred around April 2007. The plaintiff alleges that she went to Reggie Young, the new Regional Business Director, in April 2007 to make him aware of the issues that she had with Gueno's retaliation against her after her grand jury testimony and her FMLA leave, and with Gueno unfairly targeting her and singling her out. Young scheduled a meeting on May 1, 2007 with Gueno, Khami, and the other specialty representatives. Khami argues that Young was upset that she had come to him, as a regional business director, with complaints about Gueno.

Khami contends that her complaints to Reggie Young and HR are protected activities under Title VII and the Elliott-Larsen Civil Rights Act. Both Title VII and ELCRA prohibit retaliation

against an employee for complaining about discrimination. *See* 42 U.S.C. § 2000e-3(a) ("It shall

be an unlawful employment practice for an employer to discriminate against any of his employees

. . . because he has opposed any practice made an unlawful employment practice by this subchapter,

or because he has made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under this subchapter.");  Mich. Comp. Laws § 37.2701(a)

(making it unlawful to "[r]etaliate or discriminate against a person because the person has opposed

a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted,

or participated in an investigation, proceeding, or hearing under this act.").  For analytical purposes,

Michigan's Elliott-Larsen Act resembles federal law, and the same evidentiary burdens prevail as

in Title VII cases. *See In re Rodriguez*, 487 F.3d 1001, 1008 n.2 (6th Cir. 2007); *Humenny v. Genex

Corp.*, 390 F.3d 901, 906 (6th Cir. 2004); *Lytle v. Malady*, 458 Mich. 153, 172-73, 579 N.W.2d 906,

914 (1998).  "In order to establish a *prima facie* case of retaliation, a plaintiff must establish that:

(1) he engaged in activity protected by Title VII; (2) the exercise of his civil rights was known to

the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and

(4) there was a causal connection between the protected activity and the adverse employment

action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

        With regard to the fourth element, the plaintiff must offer some evidence of a causal

connection between the complaints and the adverse action, which sometimes may consist of

temporal proximity.  As the Sixth Circuit has explained:

> Where an adverse employment action occurs very close in time after an employer
> learns of a protected activity, such temporal proximity between the events is
> significant enough to constitute evidence of a causal connection for the purposes of
> satisfying a *prima facie* case of retaliation.  But where some time elapses between
> when the employer learns of a protected activity and the subsequent adverse
> employment action, the employee must couple temporal proximity with other

evidence of retaliatory conduct to establish causality. *See Little* [*v. BP Exploration & Oil Co.*, 265 F.3d 357, 365 (6th Cir. 2001)] ("[T]emporal proximity, when considered with the other evidence of retaliatory conduct, is sufficient to create a genuine issue of material fact as to" a causal connection.).

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).

It appears that Khami is alleging a mixed-motive claim of gender discrimination; therefore, she must produce sufficient evidence to establish that the defendants took an adverse employment action against her and that gender was a motivating factor for that action. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 396 (6th Cir. 2008). The following evidence is the only evidence in the record that might provide support the proposition that Khami's gender was a motivating factor behind the defendants' treatment of her. First, Khami alleges that Gueno made the following gender-based derogatory comments: "Women do not belong in the work force" and "Women belong at home with their children and not in the work force." Second, in October 2004, Khami wrote in her journal that four white females complained to Jan Jeffords-Schenck about Gueno. Mot. for Summ. J., Ex. 10, Khami's Oct. 2004 Journal Entry. Third, on May 30, 2007, Khami sent Cannady, who works with human resources, a letter to complain about feeling mistreated. She stated: "I feel mistreated; the behavior toward me from Keven Gueno has been totally irrational. It has been consistent over the last 5 years and certainly gives the appearance of being racial or gender based." Mot. for Summ. J., Ex. 30, Khami May 30, 2007 Letter.

That evidence would not permit a rational juror to infer that any of the adverse employment action alleged was prompted — even in part — by a motive to retaliate against the plaintiff for complaints about gender discrimination or a gender-hostile environment. Khami avers in her affidavit that Gueno had a history of picking on or harassing white, female employees, *see* Resp., Ex. 6, Khami aff. ¶ 1, but offers no examples besides the two stray comments mentioned above. As

her response reveals, Khami's real beef with Gueno was his purported decision to target her based on her grand jury testimony and her FMLA leave. Khami has not offered sufficient evidence to show that any purported adverse employment action is causally connected to her decision to complain to human resources personnel or Young about Gueno's treatment of women.

What is abundantly clear from the record is that Gueno and Khami had a corrosive, acrimonious working relationship. That, however, is not enough to support a claim for gender discrimination and retaliation.

### D. Whistleblower and False Claims Act retaliation claims

Khami also complains that her poor treatment at the hands of the defendants was motivated by their animus toward her because she testified before a grand jury in Boston that eventually indicted Ortho-McNeil Pharmaceutical for marketing drugs off-label. The defendants argue that adverse action occurring before November 14, 2007 cannot be pursued under the Whistleblower's Protection Act because they are barred by that Act's 90-day statute of limitations. The defendants are correct. *See* Mich. Comp. Laws § 15.363(1). The plaintiff is limited in her WPA claim to the defendants' actions involving Khami's 2007 performance evaluation, Ortho-McNeil-Janssen Pharmaceutical's failure to redeploy Khami into Pricara, and the purportedly negative comments the defendants made about Khami to other managers within the Johnson & Johnson family of companies to whom she was applying for jobs.

The defendants also present the same arguments that they advanced on the other retaliation claims, that is, that certain actions about which the plaintiff complains cannot be considered adverse; there are legitimate, non-pretextual reasons that explain the defendants' actions; and there is no causal connection between the plaintiff's grand jury testimony and the defendants' conduct. For her

part, Khami points to evidence that her complaints to Reggie Young and the human resource department included items of concern over Kevin Gueno's access to her grand jury testimony when he was preparing for his own testimony before that body, her disclaimers that she was not a willing witness but was required to testify, and her insistence that the horrible relationship she had with Kevin Gueno resulted from his belief that she had given damaging testimony about the marketing of Topamax.

"To establish a prima facie case under [the WPA], a plaintiff must show that (1) the plaintiff was engaged in a protected activity as defined by the act, (2) the plaintiff was discharged or discriminated against, and (3) a causal connection exists between the protected activity and the discharge or adverse employment action." *West v. General Motors Corp.*, 469 Mich. 177, 183-84, 665 N.W.2d 468, 471-72 (2003) (citing *Chandler v. Dowell Schlumberger, Inc.*, 456 Mich. 395, 399, 572 N.W.2d 210 (1998)). Once the plaintiff has proved a *prima facie* case, "the burden shifts to the defendant to articulate a legitimate business reason for the plaintiff's discharge." *Purcell v. Township of Tompkins*, No. 295772, 2011 WL 1564629 (Mich. Ct. App. Apr. 26, 2011); *Shaw v. City of Ecorse*, 283 Mich. App. 1, 8, 770 N.W.2d 31, 37 (2009); *see also Shallal v. Catholic Social Serv. of Wayne Cnty.*, 455 Mich. 604, 617, 566 N.W.2d 571, 577 (1997) ("Whistleblower statutes are analogous to antiretaliation provisions of other employment discrimination statutes and therefore should receive treatment under the standards of proof of those analogous statutes." (internal quotations and brackets omitted)). If the defendant is able to articulate a legitimate business reason, the plaintiff bears the burden of showing that the defendant's reason was merely pretextual. *Shaw*, 283 Mich. App. at 8, 770 N.W.2d at 37; *Eckstein v. Kuhn*, 160 Mich. App. 240, 246-47, 408 N.W.2d 131, 134 (1987).

"The whistleblower provision of the False Claims Act, 31 U.S.C. § 3730(h), encourages employees with knowledge of fraud to come forward by prohibiting retaliation against employees who assist in or bring *qui tam* actions against their employers." *United States ex rel. Patton v. Shaw Serv., LLC*, 418 F. App'x 366, 371 (5th Cir. Mar. 17, 2011) (citing *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994)). Section 3730(h), as applicable to this case, protects "lawful acts done by [an] employee . . . in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section." *Ibid.* "A claim under 31 U.S.C. § 3730(h) requires proof that the plaintiff was '(1) [ ] engaged in a protected activity; (2) [that] his employer knew that he engaged in the protected activity; and (3) [that] his employer discharged or otherwise discriminated against the employee as a result of the protected activity." *United States ex rel. Marlar v. BWXT Y-12, LLC*, 525 F.3d 439, 449 (6th Cir. 2008) (quoting *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003)).

The plaintiff's grand jury testimony amounts to protected activity under both the WPA and the anti-retaliation provision of the False Claims Act. *See Rhem v. Horn*, No. 10-10050, 2010 WL 4792175, *8 (E.D. Mich. Nov. 18, 2010) (holding that testifying before a Grand Jury constitutes reporting a violation to a public body); *see also Welch v. Ciampa*, 542 F.3d 927, 942-43 (1st Cir. 2008) (applying a similarly-worded whistleblowers' protection statute in Massachusetts and holding that the plaintiff's  participation in the grand jury investigation amounted to providing information to a "public body" within the meaning of the statute).   There is abundant evidence that the defendants were aware of the plaintiff's activity as well.

The main issue on summary judgment is causation.  However, the Court already has concluded that fact issues exist as to the defendants' motivation in taking much of the adverse action

-47-

discussed earlier in this opinion. To succeed, a plaintiff must "demonstrate that the adverse employment action was in some manner influenced by the protected activity." *West*, 469 Mich. at 185, 665 N.W.2d at 472; *McKenzie v. BellSouth Telecom., Inc.*, 219 F.3d 508, 514 n.4 (6th Cir. 2000). When the evidence is viewed in the light most favorable to Khami, it is sufficient to establish that Khami's protected activity was one reason that the defendants treated her poorly with respect to lowered performance evaluations, the failure to redeployed her into PriCara, and providing damaging references that resulted in her not being hired as a Dearborn McNeil Pediatrics sales representative or for the Bay City position.

III.

The Court concludes, therefore, that the defendants are entitled to judgment as a matter of law on the plaintiff's FMLA claims that are based on alleged adverse employment action consisting of the plaintiff's 2006 mid-year and 2006 year-end performance evaluations, any heightened scrutiny, the refusal of her vacation request, the extra e-learning classes or the requirement to complete an action plan, her territory's vacancy mode during her leave, her removal as a trainer, Khami's termination from Ortho-McNeil Neurologics, and the defendants' comments about Khami to other managers in other Johnson & Johnson divisions to which she applied for a job. Fact issues preclude summary judgment on the FMLA claim that alleges adverse action in the form of Khami's 2007 performance evaluation, Gueno's refusal to send Khami to the ACN meeting, and Khami's subsequent failure to be redeployed into PriCara. The Court also finds that fact questions preclude summary judgment on the plaintiff's public policy, Whistleblowers' Protection Act, and False Claims Act claims that are based on adverse actions consisting of the 2007 performance evaluation, Gueno's refusal to send Khami to the ACN meeting, Khami's subsequent failure to be redeployed

-48-

into PriCara, and the poor references that interfered with her obtaining a job as a Dearborn McNeil Pediatrics sales representative or for the Bay City position.  The Court also concluded that the defendants are entitled to summary judgment on the plaintiff's Title VII and Michigan Elliott-Larsen Civil Rights Act claims.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment [dkt. #100] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the following claims in the third amended complaint are **DISMISSED WITH PREJUDICE**:

A.     The FMLA claims based on the plaintiff's her 2006 mid-year and 2006 year-end performance evaluations; any heightened scrutiny; the refusal of her vacation request; the extra e-learning classes or the requirement to complete an action plan; her territory's vacancy mode during her leave; her removal as a trainer; her termination from Ortho-McNeil Neurologics; and the defendants' comments about Khami to other managers to whom she was applying;

B.     The Whistleblowers' Protection Act, and False Claims Act claims based on the plaintiff's her 2006 mid-year and 2006 year-end performance evaluations; any heightened scrutiny; the refusal of her vacation request; the extra e-learning classes or the requirement to complete an action plan; her territory's vacancy mode during her leave; her removal as a trainer; her termination from Ortho-McNeil Neurologics; and the defendants' comments about Khami to other managers to whom with respect to the Virginia position and all other positions *except* the Dearborn McNeil Pediatrics sales representative and Bay City positions; and

C.     The Title VII and Michigan Elliott-Larsen Civil Rights Act claims.

It is further **ORDERED** that the motion for summary judgment is **DENIED** in all other respects.

It is further **ORDERED** that the case management and scheduling order is modified as follows:

The proposed joint final pretrial order is due **on or before March 7, 2012**.

-49-

The Final Pretrial Conference shall take place on **March 14, 2012, at 3:00 p.m.**

Trial shall commence on **April 10, 2012, at 8:30 a.m.**

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   February 8, 2012

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 8, 2012.

s/Deborah R. Tofil
DEBORAH R. TOFIL